UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VISTEON CORPORATION, and<br>VISTEON SYSTEMS, LLC,<br><br>                     Plaintiffs,<br><br>           vs.<br><br>NATIONAL UNION FIRE INS. CO. OF<br>PITTSBURGH, PA,<br><br>                     Defendants. | 1:11-cv-00200-RLY-TAB |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This insurance dispute arises from soil and groundwater contamination at Visteon's Connersville, Indiana plant that migrated to the properties of neighboring landowners. During the relevant time period, 2000-2002, Visteon was insured by Defendants National Union Fire Insurance Company of Pittsburgh, PA and United States Fidelity & Guaranty Co.[1] (collectively "Insurers"). Both Insurers denied coverage under the pollution exclusion provisions contained within the insurance policies. Plaintiffs and National Union now move for summary judgment. For the reasons set forth below, the court **GRANTS** National Union's Motion for Summary Judgment and **DENIES** Plaintiffs' Motion for Summary Judgment.

---

[1] United States Fidelity & Guaranty Co. and Louis Heeb, a landowner, are no longer parties to this case.

I.      **Background**

Visteon operated in the 1990s as an unincorporated division of Ford Motor Company. (Deposition of Mike Sharnas ("Sharnas Dep."), Visteon App. 1841-42). Ford established Visteon as a separate wholly owned corporate subsidiary in January 2000, and subsequently transferred to Visteon the assets and liabilities comprising Ford's automotive components systems business, including the Connersville Facility (or the "Site"). (Affidavit of David Neil ("Neil Aff.") ¶ 8, at NUAPP 000190; Responses to National Union's First Set of Requests for Admission to Plaintiffs ¶ 3, at NUAPP 00204).

The Connersville Facility used raw materials to manufacture automotive component climate control system parts, including radiators, condensers, hoses, compressors, accumulators, fuel injection components and evaporators. (Neil Aff. ¶ 7, Visteon App. 439). When manufacturing these parts, the aluminum from which the parts were made had to be clean in order for the various braises, solders, and welds to hold. (*Id.* ¶ 8). As part of the cleaning process, the Site operated 13 degreasers from the early 1960s, which primarily used Tichloroethylene ("TCE") and to a lesser extent 1, 1, 1-Trichloroethane ("TCA") and Freon®. (*Id.* ¶ 9).

Multiple historical releases of TCE from the 1960s to 2000 and beyond resulted in the TCE groundwater plume from the Site. Visteon's retained expert, John Mundell, opined as follows:

> Multiple releases of hazardous substances are much more likely to have occurred during the active period of TCE degreaser usage at the Site (from the 1960s to 2000). TCE usage continued at the Facility after use of vapor degreasers was discontinued, and it is therefore likely that TCE releases continued after 2000. In addition, the previous releases of TCE into the

2

>subsurface soils and groundwater would have acted to continue to release dissolved TCE into groundwater beyond 2000.

(Mundell Report, Opinion No. 3, at NUAPP 00307-08). Included amongst the multiple ongoing releases during manufacturing operations were at least two discrete, large volume TCE releases: (1) a May 23, 1988 release of approximately 650 pounds of TCE; and (2) a February 5, 1991 release of 200 gallons of TCE. (Visteon's Reponses to National Union's First Set of Interrogatories at NUAPP 00595; Visteon's Responses to National Union's First Set of Requests for Admission to Visteon at NUAPP 00208).

In 2001, the Indiana Department of Environmental Management ("IDEM") notified Visteon of the possibility of contamination at the Site, after "impacts" were discovered during a runway extension project at the Connersville Municipal Airport. (December 18, 2009 Agreed Order between IDEM, Visteon, and the City of Connersville at NUAPP00005). Subsurface investigations revealed that some volatile organic compounds had been released into the soil and groundwater. (*Id.* at \*\* 5-6). Additional investigations revealed a groundwater plume that covered approximately 275 acres and extended from the former Visteon Facility to the Whitewater River. (Mundell Report, Visteon App. 1617). The contamination was so extensive that IDEM required Visteon to raze the home of James Pflum and relocate Mr. Pflum to a new residence in Connersville. (Neil Aff. ¶ 19, Viston App. 442). The most prevalent chemical of concern was TCE. (*Id.* ¶ 13, Visteon App. 440).

Volatile organic compounds, including TCE in the soil and groundwater, were found to be "hazardous substances" as defined in CERCLA § 101(14), 42 U.S.C. §

3

9601(14). (December 18, 2009 Agreed Order between IDEM, Visteon, and the City of Connersville at NUAPP00008).

Visteon has incurred millions of dollars in damages as a result of IDEM's demands to remediate the soil and groundwater at the Site and to defend and resolve property damage and bodily injury claims made by neighboring landowners, including a claim asserted in this lawsuit by landowner Mr. Heeb, and a lawsuit brought by Mr. Pflum and his family that was eventually settled for several million dollars. (*See generally*, Neil Aff. ¶¶ 15-24, Visteon App. 441-42). Visteon seeks defense and indemnity coverage under the umbrella insurance policies issued by National Union under Policy No. BE 7394798 for the period June 28, 2000 to June 28, 2001, and under Policy No. BE 8713538 for the period June 28, 2001 to October 15, 2002.

The Site operated continuously until it ceased operations in December 2007. (Deposition of David Martin at 50, NUAPP 00008).

## II.  Contract Interpretation

"'Interpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage.'" *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 778 N.W.2d 275, 291 (Mich. Ct. App. 2009) (quoting *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997)). National Union argues the pollution exclusion set forth in the Policy excludes coverage to Visteon. Visteon, in turn, argues that it is entitled to coverage under an exception to that exclusion – *i.e.*, the Products-Completed Operations Hazard ("PCOH"). Michigan law applies to

4

this insurance dispute. (*See* Entry on Plaintiffs' Objection to Magistrate Judge Baker's Report and Recommendation on Partial Motions for Summary Judgment dated July 22, 2013, Filing No. 184).

Insurance contracts are subject to the same rules of construction as other contracts. *Tenneco, Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 857 (Mich. Ct. App. 2008). Thus, the policy must be read as a whole to effectuate the parties' intent. *Id*. If the policy language is clear and unambiguous, Michigan courts interpret and enforce the policy as written. *Id*. "Clear and specific exclusionary provisions must be given effect, but are strictly construed against the insurer and in favor of the insured." *Hastings Mut*., 778 N.W.2d at 278-79 (citing *Auto-Owners* v. *Churchman*, 489 N.W.2d 431, 434 (Mich. 1992)). However, when an insured seeks coverage under an exception to that exclusion, the insured bears the burden of persuasion to show that the claim falls within the exception. *Polkow v. Citizens Ins. Co. of Am.*, 476 N.W.2d 382, 391, n.5 (Mich. 1991); *see also Fireman's Fund Ins. Co. v. Ex-Cello Corp.*, 702 F.Supp.1317, 1329 (E.D. Mich. 1988). The interpretation of an insurance contract is a question of law and as such, is particularly appropriate for summary disposition. *Tenneco*, 761 N.W.2d at 857.

**III. Discussion**

The court will begin its discussion with a brief review of the relevant provisions contained within the National Union Policies at issue, but for simplicity's sake, will cite to only Policy No. 8713538.

Subject to the terms, conditions, and exclusions otherwise provided, the National Union Policies grant coverage for bodily injury, property damage, personal injury, or

5

advertising injury that takes place during the policy period and is caused by an occurrence happening anywhere in the world. (8713538 Policy at NUAPP00681). Section 1 of the Named Peril and Time Element Pollution Endorsement ("Pollution Exclusion") excludes coverage for, *inter alia*, "Bodily Injury, Property Damage, or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world." (*Id*. at NUAPP00712). Section 2 excludes coverage for "[a]ny loss, cost, or expense arising out of any governmental direction or request that . . . the Insured . . . monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants," and Section 3 excludes the costs of investigation or attorneys' fees associated with the same. (*Id*.). "Pollutants" means "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material." (*Id*.). The parties agree that TCE meets the definition of a pollutant under the Policies.

      A.    **The Pollution Exclusion**

Under Michigan law, pollution exclusions like the one set forth in the National Union Policies are held to be unambiguous, and thus, act to bar coverage for damages caused by TCE and other types of pollution discharges. *See e.g.*, *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1020 (6th Cir. 1995) (TCE); *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 116 (Mich. 2005) (sewage); *United States Fire Ins. Co. v. City of Warren*, 176 F. Supp. 2d 728, 732 (E.D. Mich. 2001) (same); *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 397 (Mich. 1991) (chemical manufacturing byproducts); *McGuirk Sand & Gravel v. Meridian Mut.*

*Ins. Co.*, 559 N.W.2d 93, 97-98 (Mich. Ct. App. 1996) (water contaminated with petroleum).

Mr. Heeb's cross-claim filed in this action alleges that hazardous substances, including volatile organic compounds, were released into the soil and groundwater from the Connersville Facility and migrated onto his property, causing him substantial property damage. (Counterclaim ¶¶ 12-15, 23). The cross-claim references an IDEM order placing specific restrictions on his property, including a prohibition on the use of water wells on his property. (*Id.* ¶ 19). Mr. Pflum's Amended Complaint similarly alleges the migration of hazardous substances, namely TCE, from the Connersville Facility to his property contaminated the soil and an aquifer located underneath his property, which was the only source of drinking water for him and his family. (Pflum Amended Complaint ¶¶ 4, 18, at NUAPP00080). As a result of the contamination, the Pflum Plaintiffs allege both physical and emotional harm. (*Id.* ¶¶ 20-28).

The TCE contamination at issue here falls within this exclusion. Visteon admits, as it must, that the *Pflum* lawsuit and the *Heeb* cross-claim sought damages for bodily injury and property damage allegedly caused by the pollution releases from the Connersville Facility. Under Section 1 of the Pollution Exclusion, Visteon's damages from these landowner claims are unambiguously excluded from coverage.

Visteon also seeks damages as a result of governmental demands to investigate, remediate, and treat the pollution at and around the Connersville Facility, and damages for attorneys' fees. These damages fall within Sections 2 and 3 of the Pollution Exclusion cited above.

7

### B. Products-Completed Operations Hazard

One of the listed exceptions to the pollution exclusion in the Policies is PCOH. It is defined as:

1. [A]ll Bodily and Property Damage occurring away from premises you own or rent and arising out of Your Product or Your Work except:

    a. products that are still in your physical possession; or

    b. work that has not yet been completed or abandoned.

2. Your work will be deemed complete at the earliest of the following times:

    a. When all of the work called for in your contract has been completed.

    b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

    c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

(*Id*. at NUAPP00686). "Your Work" means, *inter alia*, "[w]ork or operations performed by you or on your behalf." (*Id*. at NUAPP000687).

Visteon argues the damages it has incurred as a result of the contamination at the Site fit squarely within the National Union Policies' PCOH coverage. Specifically, Visteon argues that the bodily injury and property damage claims by neighboring landowners arose from offsite impacts of TCE released from Visteon's Connersville Facility as a result of Visteon's "work." According to Visteon, its "work" was "completed" each time a contract for automotive parts with Ford or some other third

party was satisfied. National Union responds that, to the extent TCE releases continued to occur after Visteon began operations at the Site in 2000 (a matter of dispute), those operations were not "complete" until at least 2007, after the Policies' effective dates, when Visteon ceased actively manufacturing automotive parts at the Connersville Facility. Therefore, National Union argues, PCOH coverage does not apply.

This issue was raised in *Ohio Casualty v. Reed*, No. 1:04-cv-2027-DFH-WTL, 2006 WL 2348957 (S.D. Ind. Aug. 11, 2006). There, Ohio Casualty's insured was an industrial dry cleaning business that improperly stored and handled large quantities of hazardous chemicals including tetrachloroethene ("PCE") and TCE. *Id*. at * 2. The contamination migrated to neighboring property; the government demanded the drycleaner to engage in removal activities and several landowners filed private claims. *Id*. at ** 2-3. Like Visteon, the insured (drycleaner) in *Reed* claimed that the pollution at issue arose from "completed operations" within the ambit of a products-completed operations hazard provision substantially similar in language to that contained in the National Union Policies. *Id*. at *8. The court rejected the insured's position:

> Ohio Casualty's policies provide coverage for bodily injury and property damage only if such damages occur during the policy periods. During the relevant policy periods, Masterwear continued to operate its laundry and dry cleaning business. It did not "complete" or "abandon" general operations until a later date. As a matter of law, then, [Masterwear's] claims did not fall within the policy's completed operations coverage. *Id*. at *9. Accord, *Steyer v. Westvaco Corp.*, 450 F.Supp. 384, 393-94 (D. Mid. 1978) (concluding as a matter of law that completed operations hazard did not cover damage caused by insured's emission of air pollution as part of its ongoing, day-to-day operation of paper mill).

(*Id*. at *9).

9

Visteon posits that *Reed* supports its position because the *Reed* court found that the term "your work" in the policy at issue was broad enough to include the insured's dry cleaning operations and the chemicals used as part of those operations. *Id.* at * 7. Visteon argues that had the dry cleaner in *Reed* established that its ongoing operations were performed as part of distinct contracts and projects, the *Reed* court would have found the dry cleaner was entitled to PCOH coverage:

> [I]f Masterwear's "work" were its ordinary business operations, there would be no way to make sense of the policy provision dictating when that work would be deemed 'completed.' That provision explicitly contemplates work performed under a 'contract,' and as part of a distinct 'project.'

(*Id.* at *8).

Were the court to credit Visteon's interpretation of *Reed*, a policyholder could evade the ruling simply by characterizing the chemical emissions arising from its dry cleaning business as involving many individual projects that started and stopped with the commencement and completion of each customer's load of laundry. Such an interpretation would have the unintended effect of erasing the line between premises-operations and products-completed operations coverage, as almost any pollution claim involving offsite contamination could be characterized as a completed operations claim. *See*, John Appleman, *Insurance Law and Practice* (Berdal ed.), § 4508, (1979 and 2009 Supp.).

When read together, the court finds the only reasonable interpretation of the Products-Completed Operations Hazard provision in the National Union Policies is that this type of coverage does not extend to environmental contamination claims alleged by

10

Visteon. Instead, the provisions' references to "another contractor or subcontractor" and "job site" reflect that this provision is intended to cover offsite contractor work. *See Reed*, 2006 WL 2348957, at * 8 ("The provision's [PCOH] references to "another contractor or subcontractor" and "job site" also support Ohio Casualty's view that coverage is intended to apply to offsite contractor work."). *See also Hydro Sys., Inc. v. Cont'l Ins. Co.*, 929 F.2d 472, 477 (9th Cir. 1991) ("PCOH exclusions generally refer to "accidents caused by defective workmanship which arise after completion of work by the insured on construction or service contracts.") (citation omitted); *American Red Cross v. Travelers Indemnity Co. of Rhode Island*, 816 F. Supp. 755, 760 (D.D.C. 1993) ("The plain language of this provision indicates that it is intended to apply to construction and maintenance work, such as work performed on the premises of others by contractors and subcontractors."); *Nautilus Ins. Co. v. Don's Guns & Galleries, Inc.*, No. IP 99-0735-c-Y/G, 2000 WL 34251061, at *4 (S.D. Ind. Jan. 26, 2000) (PCOH "provides coverage for businesses that perform services or maintenance, such as contractors or subcontractors, . . . or for injuries occurring while the insured was completing an 'operation' away from the insured's premises") (internal citations omitted). As Visteon is neither a contractor nor subcontractor, and the offsite TCE contamination did not arise from offsite work, Visteon does not fall within the PCOH exception to the Pollution Exclusion. Because the Pollution Exclusion applies, National Union also has no duty to indemnify Visteon for the damages it has sustained as a result of the contamination.

    **C.    Duty to Defend**

Under Michigan law, an insurance company has a duty to defend its policyholder for all claims that are potentially covered under an insurance policy. *Polkow,* 476 N.W.2d at 383. The duty to defend is distinct from, and broader than, the duty to indemnify. *St. Paul Fire & Marine Ins. Co. v. Mich. Mut. Ins. Co.*, 668 N.W.2d 903. 903 (Mich. 2003); *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 (Mich. 1996) (citing *Detroit Edison Co. v. Mich. Mut. Ins. Co.*, 301 N.W.2d 832, 835 (Mich. Ct. App. 1980)). "'[I]f the allegations of the underlying suit arguably fall within the coverage of the policy, the insurer has a duty to defend its insured.'" *Radenbaugh v. Farm Bureau*, 610 N.W.2d 272, 275 (Mich. Ct. App. 2000) (quoting *Royce v. Citizens Ins. Co.*, 557 N.W.2d 144, 147 (1996)).

Comparing the allegations of Mr. Heeb's cross-claim and the Pflum's Amended Complaint with the National Union Pollution Exclusion in both Policies at issue (*see* Section III.A of this opinion), the court finds the allegations of the underlying claims do not arguably fall within the Policies' PCOH coverage. As noted above, the contamination at issue falls squarely within the Pollution Exclusion.

Moreover, the Pollution Exclusion modifies National Union's defense obligations. It provides:

> [S]olely as respects any coverage granted by this endorsement, the following shall apply to any occurrence which is covered by this policy but not covered by the underlying policies listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage due to an exclusion(s) contained therein: . . . . We will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however, have the right and shall be given the opportunity to participate in the

12

> defense and trial of any claims, . . . which, in our opinion, may create liability on our part under the terms of the policy.

(8713538 Policy at NUAPP00714). The underlying USF&G Policy did not provide PCOH coverage; National Union's did. Thus, even if PCOH coverage were arguably at issue, National Union would not have a duty to defend Visteon.

Having so found, the court need not address the additional issues raised by the parties, including whether Visteon's claims exhaust the retained limits underlying the National Union Policies, whether National Union is liable for all of the damages Visteon seeks, whether Visteon's liability arises from a single "occurrence," whether Visteon complied with the notice provisions in the National Union Policies, and whether Visteon's claimed damages were reasonable and necessary.

## IV. Conclusion

For the reasons set forth above, National Union's Motion for Summary Judgment (Filing No. 226) is **GRANTED**, and Visteon's Motion for Summary Judgment as to Products Completed Operation Hazard Coverage Under National Union's Policies (Filing No. 216) is **DENIED**.

**SO ORDERED** this 7th day of July 2014.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.